# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael B. Hari, | Case No. 19-cv-1330 (ECT/TNL) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| James Stuart, et al., | |
| Defendants. | |

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendants' Motion for Summary Judgment (ECF No. 88) and Plaintiff's Motion to Strike Under Rule 12. (ECF No. 96). These motions have been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. (ECF No. 98). Based on all the files, records, and proceedings herein, and for the reasons set forth below, this Court recommends that Defendants' motion be **GRANTED** and Plaintiff's motion be **DENIED.**

## I. PROCEDURAL HISTORY

Plaintiff Michael B. Hari filed suit on May 20, 2019. (ECF No. 1). Hari amended his complaint as a matter of right once and the Court granted him leave to amend his complaint once. (ECF No. 57). Hari alleges the following claims in his operative complaint: violations of his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") against Defendants in their personal capacity; violations of his

First Amendment Rights against Defendants in their personal and official capacity; violations of his rights under the Due Process Clause of the Fourteenth Amendment Rights against Defendants in their personal and official capacity; and violations of his rights under the equal protection clause of the Fourteenth Amendment. Hari seeks compensatory and punitive damages as a result of Defendants' conduct, as well as injunctive relief. Defendants answered the complaint and moved for summary judgment on June 1, 2020. (ECF No. 88).

## II.     MOTION TO STRIKE

Hari has moved, pursuant to Federal Rule of Civil Procedure 12(f), to strike a footnote and "other scurrilous language" from Defendants' summary judgment memorandum. (ECF No. 96). Under Rule 12(f), the Court may strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A party may not use a Rule 12(f) motion to challenge statements made in a party's memorandum of law or supporting documentation. *VanDanacker v. Main Motor Sales Co.*, 109 F. Supp. 2d 1045, 1047 (D. Minn. 2000). The Court therefore recommends the motion to strike be denied.

## III.    MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Under Rule 56(a), courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions

of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'") (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). In considering such a motion, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (quotation and citation omitted). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1); *Torgerson*, 643 F.2d at 1043.

With one exception, Hari's claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. The "purpose

of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

**B. Facts**

Hari was arrested in March 2018. (ECF No. 92, p. 59). He has been indicted in this District on several charges related to the bombing of an Islamic Center and Mosque in Bloomington, MN. (*See* ECF No. 1, *United States v. Hari, et al.*, 18-cr-150 (D. Minn.)). He also faces charges in Illinois that relate to the unlawful possession of weapons, attempted arson, interference with commerce by threats and violence, and unlawful possession of a firearm. *United States v. Hari*, No. 18-cr-150 (C.D. Ill.).

In February 2019, the United States Marshals Service ("USMS") transported Hari from Illinois to the Sherburne County Jail. (ECF No. 92, p. 58-60). At some point during the transport, Hari attempted to escape. (*Id.*, p. 58). Hari remained at the Sherburne County Jail until April 25, 2019, at which point he was transferred to the Anoka County Jail. (ECF No. 91, p. 2).

The Anoka County Sheriff's Office has a written policy that governs the searches of those detained or incarcerated at the Anoka County Jail, including pat-down searches. (ECF No. 92, p. 64). A pat-down search "involves a thorough patting down of clothing to locate any weapons or dangerous items that could pose a danger to the deputy, the inmate, or other inmates. (*Id.*). The search policy requires staff to conduct pat-down searches of inmates when they enter the secure booking area of the jail; they leave and return to their housing units; during physical plant searches of entire housing units; whenever inmates

4

come into contact with other inmates outside their housing unit; and any time staff believed an inmate was in possession of contraband. (*Id*., p. 65).

Under the policy, male staff may not pat down female inmates unless there is an emergency. (*Id*.). Female staff may pat down a male inmate, provided the search is documented. (*Id*.). The policy also recommends, but does not require, that another staff member witness any cross-gender pat-down search. (*Id*.). The Anoka County Jail permits female staff to search male inmates "based in part on the staffing and security demands of the jail." (ECF No. 91, p. 3). Because there is a "high volume of routine pat searches every day," requiring same-gender pat searches of male inmates would disrupt jail staffing and resources, as well as the security of the jail. (*Id*., p. 3-4). During the time period relevant to this lawsuit, at least 75 percent of the Anoka County Jail population was male. (ECF No. 92-1, p. 44). Less than half of the jail staff responsible for pat searches was female. (ECF No. 101-1, pp 2-4).

Inmates arriving at the Anoka County Jail are given an initial security classification that is based upon the severity of the inmate's charges, offense history, and escape history. (ECF No. 91, p. 2). Unless the inmate is in "Max custody," the inmate's classification is then reviewed seven days after arrival, 14 days after arrival, and every 30 days thereafter. (ECF No. 91, p. 2).

A male inmate's security classification is used to determine what unit the inmate will be housed in at the Anoka County Jail. (ECF Nos. 91, p. 1 & 92, p. 96). Unit 1 houses minimum custody inmates; Unit 2 houses medium custody and general population inmates; Unit 4 houses inmates in disciplinary lockdown and administrative segregation; Unit 5

5

houses "max custody" inmates; and Unit 6 houses medium custody and general population inmates. (ECF No. 91, p. 1-2). From April 2019 to May 2019, Unit 6 housed maximum custody inmates. (*Id.*, p. 2).

When Hari arrived at the Anoka County Jail, he was classified as a maximum custody inmate, based on his "pending criminal charges, his past conviction for child abduction and his attempted escape from a [USMS] transport van." (*Id.*, p. 2). Jail policy required that he remain on max custody for at least 14 days and that he not be reclassified until after his 30 day classification review to ensure he would not pose a safety concern based upon his escape attempt and the fact that he was in administrative segregation before he arrived at the jail. (*Id.*). Hari was placed in Unit 6, where he remained until May 2019.[1] (*Id.*). At that point, he was transferred to a cell in Unit 5. (*Id.*).

On May 5, 2020, Deputy JoAnn Maro asked Hari to submit to a pat-down search as he returned from program activity. (ECF No. 92, p. 72). Hari informed her that under his religious beliefs, it was "indecent" for an unrelated female to touch him. (*Id.*). Maro contacted her supervisor, who told her that if Hari refused to be pat searched, he would "have to go to the hole." (*Id.*, p. 115). Maro relayed this information to Hari, who then complied with the search. (*Id.*, pp. 72, 115). Maro then conducted the pat-down search by "patting [Hari's] clothes on [his] limbs and trunk with a patting and rubbing motion." (*Id.*, p. 72). The pat-down search lasted approximately one minute. (*Id.*, p. 73).

---

[1] Deputy Michael Mingo conducted Hari's first classification review on May 1, 2020. (ECF No. 92, p. 103). Deputy Mingo determined Hari would retain maximum custody status "due to him being an escape risk." (*Id.*).

6

A few days later, Deputy Mingo conducted another classification review of Hari. Deputy Mingo noted that Hari's classification would remain the same because he was an escape risk and had not complied with pat searches by female deputies. (*Id*., p. 103). Hari remained in maximum custody. (*Id*.).

Approximately a day or two after the classification review, Deputy Maro conducted another pat-down search of Hari as he returned from program activity. (*Id*., p. 73). The search was conducted in a manner identical to the one that took place on May 5th. (*Id*.). Again, the search lasted approximately one minute. (*Id*.). Hari was assigned to a max custody cell in Unit 5 after the second search. (ECF No. 91, p. 3).

Hari filed several grievances after both pat searches. He alleged the searches were unlawful and that jail staff retaliated against him for refusing to comply with the May 5 search by keeping him in maximum custody. (ECF No. 92-1, p. 3-10) Anoka County Jail staff responded each time and informed him that the searches were authorized by law. (*Id*.). Staff also informed him that his custody classification was the result of his previous escape attempt, his current charges, and his offense history (*Id*., p. 8). Staff also noted that his refusal to cooperate with pat searches constituted a security risk. (*Id*., p. 6).

At the end of May, Anoka County Jail deputies conducted a "shakedown" of Hari's cell. They noticed the electrical outlet had been disconnected from the wall and been tampered with it. (*Id*., p. 34). They also observed a torn open pillow and "scrape marks" around a vent by the toilet that had been covered with toothpaste. (*Id*., p. 34). Staff moved Hari to "pre-hearing lockdown" and charged him with several violations of jail regulations. (*Id*.). Hari went on a hunger strike the following day. (*Id*.). Deputy Mingo later directed

7

that Hari be placed in administrative segregation in the disciplinary unit; that "[d]aily shakedowns" be conducted of his cell; and that Hari be waist belted and placed in leg shackles for movements within the jail as a result of his violating jail rules. (*Id.*).

Between June 10 and July 1, 2019, an Anoka County Jail sergeant conducted several reviews of Hari's classification status. (ECF No. 92, pp. 103-04). Each time, the sergeant determined that Hari should remain in administrative segregation, noting that he was an escape risk, that he was on a hunger strike, and that he was found guilty of tampering with a safety device. (*Id.*). Toward the end of June, Hari ended his hunger strike and asked that he be issued double portions of food. (*Id.*). He complained to the sergeant when he was not given those portions. (*Id.*).

On July 16, 2019, an Anoka County Jail sergeant ordered Hari to be transferred to the medical unit, where he would have "access to food items from [the] canteen and [would] have more time out of his cell." (*Id.*). Hari remained in administrative segregation while in the medical unit. (*Id.*).

At some point beginning in June 2019 and continuing over the next month, Anoka County Jail staff noticed that inmates located in the same area as Hari began to "submit[] coordinated grievances and kites for issues and conduct that they had previously not grieved." (ECF No. 91, p. 4). Hari also submitted several additional grievances during this time. (ECF No. 92-1, p. 15-27). Staff believed that the increase in grievances was the result of Hari's influence and found that the time it took to respond to those grievances was placing a "strain" on jail resources, which took "time and attention away from other Jail functions." (ECF No. 91, p. 4).

In late July 2019, the Anoka County Jail requested that Hari be transferred. (ECF No. 92-1, pp. 36-37). Staff explained that Hari's "behavior issues have become a strain on our resources;" that he was taking one of only two spots in the jail's medical unit; that he was considered an escape risk as the result of his past conduct; that he required two-staff escorts and could only attend recreation time when alone; and that he took apart an electrical outlet in his cell. (*Id*., pp. 36-37). A few weeks later, Hari was transferred to the Sherburne County Jail, where he was placed in "MAX AD SEG STATUS." (*Id*., pp. 43-44).

### C. Hari's Request for Injunctive Relief is Moot.

For several of his claims, Hari seeks injunctive relief against Defendants in their official capacities. Once an inmate has been transferred, injunctive relief claims that relate to the conditions of confinement are moot. *See Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012). The parties agree that Hari has been transferred from the Anoka County Jail.[2] The Court recommends that summary judgment be granted on Hari's claims for injunctive relief against Defendants in their official capacities.

### D. Count One

In Count One of his complaint, Hari alleges that the two pat searches conducted by Deputy Maro in May 2019 violated his rights under the Free Exercise Clause of the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the RLUIPA. The Court will begin with Hari's First Amendment claim. To establish a claim under the Free

---

[2] Hari claims summary judgment should not be granted because Defendants indicate he is still at the Anoka County Jail. Hari's reference is to an obvious typographical error. Hari himself lists his address as the Sherburne County Jail in the same memorandum.

9

Exercise Clause of the First Amendment, Hari must show that Defendants placed a substantial burden on his ability to practice his religion. *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997). A substantial burden exists if Defendants (1) "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs"; (2) "meaningfully curtail a person's ability to express adherence to his or her faith"; or (3) "deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (citation omitted).

Summary judgment is appropriate on this claim. De minimis impositions on a person's ability to practice his or her religion do not constitute the type of violation with which the Constitution is concerned. *Bell v. Wolfish*, 441 U.S. 520, 539 n. 21 (1979);[3] *see also Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (noting that an inmate's exposure to raw sewage for four consecutive days was nothing more than a de minimis imposition of the inmate's constitutional rights). Viewing the record in a light most favorable to Hari and drawing all factual inferences in his favor, he has demonstrated at most that Deputy Maro performed two pat searches on him, each of which lasted a maximum of 60 seconds. "[S]hort term and sporadic" disruptions of an inmate's religious practices do not substantially burden the inmate's religious freedoms. *Blake v. Cooper*, No. 10-cv-6063,

---

[3] It is not clear if Hari challenges the pat-down searches on Fourth Amendment grounds. In the operative complaint, he claims the pat-down searches violated his "due process rights . . . under the Fourth Amendment. (ECF No. 61, p. 5). It appears, based on subsequent allegations, that Hari is claiming a violation of his rights under the Due Process Clause of the Fourteenth Amendment. But even if he intended to also raise a Fourth Amendment claim, the Court would recommend that summary judgment be granted because the two searches would still constitute only a de minimis violation of his constitutional rights. *See Bell*, 441 U.S. at 539 n. 21.

2013 WL 523710, at *2 (W.D. Mo. Feb. 12, 2013), *aff'd sub nom. Blake v. Missouri Dept. of Corr.*, 628 Fed. App'x 465 (8th Cir. 2016); *see also Maynard v Hale*, No. 11-cv-1233, 2012 WL 3401095, at *4 (M.D. Tenn. Aug. 14, 2012) (explaining that missing a single pre-dawn meal during Ramadan did not inhibit an inmate's ability to practice his religion). The same analysis applies when an inmate argues that isolated cross-gender pat searches violate his or her religious beliefs. *Ha'Keem v. Mesojedec*, No. 16-cv-348, 2019 WL 1118916, at *8 (D. Minn. Jan. 16, 2019), *report and recommendation adopted in part, rejected in part*, 2019 WL 927314 (D. Minn. Feb. 26, 2019). The Court recommends summary judgment be granted on this claim.

The Court will next consider Hari's due process claim. "The Due Process Clause of the Fourteenth Amendment ensures that states do not deprive individuals of life, liberty, or property without due process of law." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (citing U.S. Const. amend. XIV, § 1). To prevail in his due process claim, Hari must show that government action deprived him of a protected liberty interest, which requires him to identify conditions that impose a "atypical or significant hardship" in comparison to the ordinary "incidents of prison life." *Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010) (citation omitted).

Hari has failed to do so. Two, isolated, short cross-gender pat searches by do not constitute an atypical or significant hardship when compared to the ordinary incidents of prison life, even when considering Hari's religious objections to those searches. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) (explaining that short limitations on a person's ability to freely practice his or her religion do not constitute atypical or substantial

11

hardships); *cf. Laing v. Guisto*, 92 F. App'x 422, 424 (9th Cir. 2004) ("We have repeatedly held that searches or surveillance of male prisoners by female guards does not violate the constitution."). The pat searches are important to the jail's operations; they protect other prisoners and jail staff and ensure contraband is no transferred between different areas. Furthermore, compared to other actions that courts have concluded did not violate an inmate's due process rights, the pat searches are relatively unintrusive. *See Hemphill v. Delo,* 124 F.3d 208 (table) (8th Cir. 1997) (per curiam) (holding that "four days locked in a housing unit, thirty days in disciplinary segregation, and approximately 290 days in administrative segregation" does "not constitute an 'atypical and significant hardship' when compared to the burdens of ordinary prison life."). The record before the Court establishes that pat searches are part of the ordinary "incidents of prison life." *See Orr*, 610 F.3d at 1034. Summary judgment is appropriate on this claim.

Hari's final claim in count one alleges a violation of his rights under the RLUIPA against Defendants in their personal capacities only. The RLUIPA prohibits governments from imposing a substantial burden on the religious exercise of a confined person unless it is in furtherance of a compelling government interest and the burden is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a). The RLUIPA does not, however, permit inmates to bring cases against prison officials in their individual capacities. *Al-Kadi v. Ramsey Cnty.*, No. 16-cv-2642, 2019 WL 2448648, at *6 (D. Minn. June 12, 2019). The Court therefore recommends summary judgment be granted on this claim as well.

### E. Count Two

In count two, Hari alleges two violations of his rights under the Equal Protection Clause. The Equal Protection Clause prohibits States from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In assessing these claims, the Court must first consider whether Defendants treated Hari "differently from others similarly situated." *Gilmore v. County of Douglas, State of Neb.*, 406 F.3d 935, 937 (8th Cir. 2005). If this threshold showing is met, the Court must then consider whether the disparate treatment is rationally related to a legitimate penological interest. *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998).

Hari first alleges that Defendants treat male inmates different than female inmates because Defendants only allow cross-gender pat searches of male inmates. Even if the Court were to assume that male and female inmates are similarly situated, the Court would still recommend that summary judgment be granted on this claim. The facts here implicate several issues: "the rights of the prisoners, the equal employment rights of both the female guards and the male guards, and the institutional need for internal security." *Timm v. Gunter*, 917 F.2d 1093, 1099 (8th Cir. 1990). The complexities of these varying interests present a good example of why courts evaluate equal protection challenges to prison regulations under a less strict standard than the typical challenge. *Id.*

In this case, Defendants have established that the disparate treatment of male and female inmates is related to legitimate penological interests. As discussed above, pat searches are integral to jail security. They ensure inmates do not smuggle weapons or other dangerous weapons or other contraband throughout the facility. Pat searches take place

frequently and on short notice, as they occur whenever an inmate leaves his or her housing area or comes into contact with another inmate from another unit. Because the vast majority of Anoka County Jail inmates are male, it would greatly disrupt jail resources and security to require a male deputy to respond every time a pat search is required of a male inmate. *See id*. (explaining that differences in number of inmates and frequency of incidents can justify differences in security measures taken regarding female and male inmates). This would ultimately have the effect of compromising institutional security.

Furthermore, the Anoka County Jail has established the disparate treatment is rationally related to another important penological interest: providing "equal job opportunity for women in fields traditionally closed to them." *Madyun v. Franzen*, 704 F.2d 954, 962 (7th Cir. 1983). For the Anoka County Jail to provide those opportunities, however, it must permit women to perform effectively "the tasks essential to the security of the prison." *Id*. Here, the record establishes that, because the Anoka County Jail has a high proportion of male inmates, women deputies must be permitted to pat search those inmates so if they are to be able to perform important tasks that are essential to the operations of the jail. (ECF No. 91). Accordingly, the gender-based distinction here substantially advances an important government interest because it "equalize[s] opportunities for women to serve as guards" in a jail that houses mostly male inmates. *Maydun*, 704 F.2d at 962. Summary judgment is appropriate for this reason as well.[4]

---

[4] In *Timm*, the Eight Circuit Court of Appeals also considered whether there were other alternatives to the regulation that could be made available at a de minimis cost to prison objectives. 917 F.2d at 1099 (citing *Turner v. Safley*, 482 U.S. 78, 91 (1987)). Nothing in the record suggests that such alternatives exist.

Hari next alleges that Defendants violated his equal protection rights by treating him different on account of his religion. Hari's claim is based on his allegation that Defendants assigned him a higher security classification than other inmates who "expressed no religious belief on the subject of the appropriateness of cross-gender pat-down searches." (ECF No. 111, p. 2).

For Hari's equal protection claim to survive summary judgment, he must be able to demonstrate that he was treated differently from others similarly situated to him *in all relevant respects*. *Arnold v. City of Columbia, Mo.*, 197 F.3d 1217, 1220 (8th Cir. 1999); *Bills v. Dahm*, 32 F.3d 333, 335 (8th Cir. 1994). It is not enough that Hari claims he received higher security classifications than inmates who complied with the pat searches. He must show that there were inmates who objected to or failed to comply with the pat searches for non-religious reasons and that Defendants did not assign higher security classifications (or maintain already high security classifications) to those inmates.[5] *See id*. Hari would also need to be able to demonstrate that there was no other reason why those inmates were treated differently. *Id*.

Hari has done nothing more than speculate that other inmates who did not comply with the pat searches were treated differently than him. He has not identified with any specificity any inmate who objected to the searches on non-religious grounds. Nor has he provided any evidence to show that Defendants treated the security classification of those inmates different than him. In fact, while Hari's classification reviews reference his

---

[5] Alternatively, Hari could also have argued that Defendants treated differently inmates of other religions who also objected to the pat searches. He does not make such a claim here.

15

objection to the pat searches, they also note that Hari's security classification was based on "objective" criteria, that included his prior escape attempt, his offense history, and his pending criminal charges. (ECF No. 92-1, p. 8). This is the same criteria that Defendants apply to other inmates when assessing their security classification. (ECF No. 91, p. 2). Summary judgment is appropriate on this claim as well.

Finally, Hari alleges in count two that Defendants unlawfully retaliated against him for objecting to the pat searches on religious grounds and by filing grievances regarding those searches. He claims that Defendants did so by assigning him a higher security classification. To establish an unlawful retaliation claim, Hari must demonstrate that (1) he engaged in protected activity; (2) Defendants adversely responded in a way that would "chill a person of ordinary firmness;" and (3) the adverse action was motivated by the protected activity. *L.L. Nelson Enters., Inc. v. Cnty of St. Louis, Mo.*, 673 F.3d 799, 807-08 (8th Cir. 2012) (citation omitted).

In assessing the third prong, the Court must consider whether but for the retaliatory motive, Defendants would have engaged in the retaliatory conduct. *Haynes v. Stephenson*, 588 F.3d 1152, 1156 (8th Cir. 2009). Here, Anoka County Jail staff initially classified Hari at the highest security level because of the severity of his current charges, his offense history, and the fact that he was deemed an escape threat. (ECF No. 92, p. 96-97). Though jail staff made note of Hari's objections to the pat searches in subsequent classification reviews, they also noted that max custody continued to be appropriate because of Hari's past escape attempt, his offense history, and his current charges. (ECF Nos. 92, p. 103; 92-1, p. 8). The classification logs do not suggest that Hari's objection to the pat searches or

16

his subsequent grievances were the deciding factor in maintaining his security classification at the highest level.

Accordingly, the Court need not address whether Hari engaged in protected activity. Even assuming that he did for purposes of this motion, the record contains ample evidence to show that the Anoka County Jail's classification of Hari was based on factors other than his refusal to comply with pat searches and the related grievances. Before Hari even refused to comply with pat searches, jail staff had already concluded that his escape attempt, offense history, and the severity of his charges merited max custody classification. In their subsequent reviews, staff continued to reference these factors in deciding to maintain his classification status. Hari is therefore unable to show that, but for a retaliatory motive, Defendants would have classified him at a lower security level. The Court recommends summary judgment be granted on this claim.

### F. Count Three

In count three of his complaint, Hari alleges that Defendants violated his First Amendment rights by transferring him to the Sherburne County jail in retaliation for filing grievances and assisting other inmates in filing grievances. "Generally, prisoners have no constitutional right to remain in a particular institution." *Rentschler v. Kaiser*, 72 F.3d 133 (8th Cir. 1995) (table). Prison officials may not, however, transfer a prisoner in retaliation for exercising a constitutional right. *Sisneros v. Nix*, 95 F.3d 749, 751 (8th Cir. 1996). The same legal standard applies here as did with Hari's retaliation claims related to his classification.

To the extent that Hari claims Defendants retaliated against him for his encouraging other inmates to file grievances, summary judgment is appropriate because he failed to establish that he engaged in constitutionally protected activity. "[I]nmates do not have a constitutional right to incite other inmates to file grievances or to assist other inmates in filing lawsuits." *Rouse v. Benson*, 193 F.3d 936, 941 (8th Cir. 1999). And to the extent Hari claims Defendants retaliated against him for filing his own grievances, he has again failed to show that, but for the retaliatory motive, Defendants would not have recommended that he be transferred. *See Haynes*, 588 F.3d at 1156. The record establishes that jail officials had clear concerns regarding the strain Hari was placing on their resources, particularly given the fact that he was an escape risk; that he had been disciplined for tampering with an electrical outlet; and that he was taking one of two spots in the jail's medical wing; and that he required multiple staff escorts when transferred between areas of the jail. Hari's vague claim that defense counsel in his criminal case informed him that he was transferred because he filed grievances is too speculative to create a genuine question of fact for purposes of summary judgment. *See Scott*, 550 U.S. at 380. Here, the record establishes that jail officials did not ask for Hari's transfer in order to punish him for filing grievances, but because of the considerable strain his behavior was putting on their resources. The Court recommends summary judgment be granted on this claim.[6]

---

[6] Defendants correctly note that as federal pretrial detainee, the USMS has final decision-making authority regarding Hari's transfer. The Court construes Hari's claim as alleging that Defendants retaliated against him by requesting that he be transferred. The Court need not decide whether such a request is sufficient to form the basis for a retaliation claim because even if it were, Hari has failed to establish that he engaged in constitutionally protected activity or that but for the retaliatory motive, Defendants would have requested his transfer.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion to Strike Under Rule 12 (ECF No. 96) be **DENIED**; and

2. Defendants' Motion for Summary Judgment (ECF No. 88) be **GRANTED**, the matter be **DISMISSED WITH PREJUDICE**, and judgment be entered accordingly.

Date: August 21, 2020                                  *s/ Tony N. Leung*
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       District of Minnesota

                                                       *Hari v. Stuart, et al.*
                                                       Case No. 19-cv-1330 (ECT/TNL)

## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).